IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



TROY AURELIUS TITUS,

        Petitioner,

v.

                                          CIVIL ACTION NO. 2:13cv575
                                    CRIMINAL ACTION NO. 2:08cr154

UNITED STATES OF AMERICA,

        Respondent.

## *MEMORANDUM OPINION & ORDER*

This matter is before the Court on Petitioner Troy Titus' Motion to Vacate, Set Aside or

Sentence pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion" or "§ 2255 Petition"). ECF No. 300.

Petitioner has also filed a Motion for Discovery related to the § 2255 Motion. ECF No. 310. For

the reasons stated below, Petitioner's Motions are **DENIED**.

## I. FACTS AND PROCEDURAL HISTORY

On March 25, 2009, Petitioner was named in a forty-nine count Third Superseding

Indictment. ECF No. 50. It charged Petitioner with one count of bank fraud, 18 U.S.C. § 1344,

one count of conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349, twenty-four counts of

wire fraud, 18 U.S.C. § 1343, five counts of mail fraud, 18 U.S.C. § 1341, ten counts of

promotional money laundering, 18 U.S.C. § 1956(a)(1)(A)(i), and eight counts of engaging in

financial transactions with criminally derived property, 18 U.S.C. § 1957. A jury trial started on

November 10, 2009 and the jury began deliberating on December 15, 2009. On December 18,

2009, it found Petitioner guilty of thirty-three counts: the conspiracy count, sixteen of the wire

1

fraud counts, all five of the mail fraud counts, four of the promotional money laundering counts, and seven of the unlawful financial transactions counts. ECF No. 214. It acquitted Petitioner of eight counts and was unable to reach a verdict as to six counts. *Id.* On April 15, 2010, the Court sentenced Petitioner to a total of three hundred sixty (360) months of imprisonment.

Petitioner appealed his convictions to the United States Court of Appeals for the Fourth Circuit, which rejected his claims on April 13, 2012. *United States v. Titus*, 475 F. App'x 826 (4th Cir. 2012). The United States Supreme Court denied his petition for a writ of certiorari on October 1, 2012. *Titus v. United States*, 133 S. Ct. 316 (2012). A year later, Petitioner timely filed his § 2255 Motion and accompanying memorandum and exhibits. ECF Nos. 300, 301. In his Motion, he raises multiple claims of ineffective assistance of counsel against his first counsel, the second counsel who replaced first counsel prior to trial, and a third counsel who prepared his petition for certiorari. Petitioner claims that his first attorney was ineffective during plea bargaining, that his second was ineffective in preparing for and during trial as well as during his appeal to the Fourth Circuit, and that his third was ineffective in the Supreme Court. On October 24, 2013, the Court ordered the Government to respond to Petitioner's Motion. ECF No. 302. Before the Government filed its Response, the Court also granted its Motion to Compel. That Order directed Petitioner's former counsel to provide the Government with information required to respond to the allegations in Petitioner's Motion. ECF No. 306. On January 27, 2014, the Government filed its Response accompanied by affidavits from Petitioner's former counsel. ECF No. 307. It also filed a Supplemental Memorandum with an additional affidavit on January 31, 2014. ECF No. 308. On February 10, 2014, Petitioner filed his Reply to the Government's Response. ECF No. 309. On the same day, he filed a Motion for Discovery asking the Court to order the production of various documents. ECF No. 310.

2

Petitioner's § 2255 Motion and Motion for Discovery are now fully briefed and ripe for disposition.

## II. LEGAL STANDARD

Section 2255 of Title 28 of the United States Code governs post-conviction relief for federal prisoners.  It provides in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.  In a proceeding to vacate a judgment of conviction, the petitioner bears the burden of proving his or her claim by a preponderance of the evidence.  *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).  Additionally, *pro se* filers are entitled to more liberal construction of their pleadings.  *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), *cert. denied*, 439 U.S. 970 (1978) (providing that a *pro se* petitioner is entitled to have his petition construed liberally and is held to less stringent standards than an attorney drafting such a complaint).  When deciding a § 2255 motion, the Court must promptly grant a hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).  Motions under § 2255 "will not be allowed to do service for an appeal." *Sunal v. Large*, 332 U.S. 174, 178 (1947).  For this reason, issues already fully litigated on direct appeal may not be raised again under the guise of a collateral attack.  *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976).  Ineffective assistance of counsel claims, however, should generally be raised in a collateral motion instead of on direct appeal.  *United States v. Richardson*, 195 F.3d 192, 198 (4th Cir. 1999).

3

Claims of ineffective assistance of counsel in violation of the Sixth Amendment are governed by the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner must show both: (1) that counsel's representation was deficient, and (2) that Petitioner was prejudiced by counsel's performance. *Id.* at 687. If Petitioner makes an insufficient showing on one prong, the court need not address both components of the inquiry. *Id.* at 697. In order to demonstrate deficient performance, Petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Petitioner must overcome a strong presumption that counsel's performance falls within a "wide range of reasonable professional assistance." *Id.* at 689. To show prejudice, Petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### III. ANALYSIS

#### A. Ineffective assistance during plea bargaining – Attorney Dalton

##### 1. Plea offer

During the course of the criminal proceedings in this Court, Petitioner was represented by two different attorneys. In early October 2008, about a month after Petitioner was first indicted, the Court appointed Walter Dalton of the Federal Public Defender's Office as Petitioner's defense counsel. Petitioner's principal claim of ineffective assistance by Attorney Dalton centers on the plea offer the Government extended to Petitioner in November 2008 and later withdrew after Petitioner declined to plead guilty. At that time, Petitioner was subject to a First Superseding Indictment that named Petitioner in fifteen counts of conspiracy and mail and wire fraud. ECF No. 26. The draft plea agreement, which the Government sent to Attorney Dalton

4

on November 19, 2008 along with a draft Statement of Facts, specified that Petitioner would plead guilty to one count of wire fraud, 18 U.S.C. § 1343, which carried a statutory maximum penalty of twenty years of imprisonment. Petr's Supporting Memorandum, ECF No. 301 (hereinafter "Supp. Mem."), Ex. B. All parties agree that Attorney Dalton immediately transmitted the offer to Petitioner. *E.g.*, Supp. Mem. 2; Govt. Response, Ex. A (Affidavit of Walter B. Dalton) ¶ 3. He included an estimated U.S. Sentencing Guidelines calculation that predicted an offense level of 30 and a sentence of 97-121 months if Petitioner accepted the agreement. Supp. Mem. Ex. B. Petitioner further acknowledges that Attorney Dalton met with Petitioner "right away," "thoroughly" reviewed the offer with him, and answered all of his questions. *Id.* at 2.

As to the content of the discussions between Petitioner and Attorney Dalton about the potential plea agreement, Petitioner has presented substantially different versions of events in his affidavit that he attached to his § 2255 Petition, Supp. Mem., Ex. A, and in his affidavit that accompanied his Reply, ECF No. 309, Ex. A. The latter, of course, was written after Petitioner had the benefit of reading Attorney Dalton's own affidavit and the Government's Response.

In the affidavit attached to his § 2255 Petition, Petitioner avers that Attorney Dalton told him that the likely sentence under the proposed plea agreement would be 9-12 years, although that was not guaranteed. Supp. Mem., Ex. A ¶ 1. Further, he says that Attorney Dalton recommended that Petitioner enter into the plea agreement even though it guaranteed no ascertainable benefit. *Id.* Petitioner's principal claim of error is that Attorney Dalton never explained to him that the plea agreement would be beneficial because it would limit Petitioner's sentence to a maximum of 20 years. *Id.* The only benefit he informed Petitioner of was that the Government would withdraw the plea and supersede the indictment if Petitioner did not accept it.

*Id.* ¶ 4. According to Petitioner, Attorney Dalton never even "suggest[ed] that [Petitioner] could receive more than 12 years" if he went to trial and was convicted. *Id.* ¶ 1. He should have informed Petitioner that if he went to trial, he would face "a life sentence," even if convicted of only one count.[1] *Id.* If Attorney Dalton had, Petitioner says he would have accepted the plea agreement. Petitioner also claims in his first affidavit that Attorney Dalton "never explained to me how the U.S. Sentencing Guidelines were structured and how they would be applied to my case." *Id.*

In his affidavit, which accompanied the Government's Response, Attorney Dalton says that he provided Petitioner with the plea agreement, statement of facts, and an estimated sentencing guidelines calculation. Govt. Response, Ex. A, ¶ 4. Further, he says he "reviewed them with him in detail" and "advised [Petitioner] of the offer's benefits, such as limiting his exposure to no more than twenty (20) years, and receiving credit for acceptance of responsibility." *Id.* He also says that the offer was discussed several times and that the Government extended the deadline for accepting it, but that in the end Petitioner "indicated that it was unacceptable." *Id.* ¶ 5.

In the affidavit attached to his Reply, Petitioner says that reviewing those documents "caused [him] to remember additional details." ECF No. 309, Ex. A ¶ 4. Contrary to his initial affidavit, Petitioner says that Attorney Dalton *did* in fact affirmatively inform him that the plea

---

[1] Petitioner is incorrect that he should have been informed that he would face "life" if convicted, even if convicted of only one count. Although the Guidelines range at Petitioner's sentencing was indeed life in prison, because each count carried a statutory maximum of either ten or twenty years, the Court would not have had the authority to enter a life sentence instead of a sentence of a term of years. And if Petitioner had been convicted only of one count, he would not have faced a life sentence, contrary to Petitioner's contention, but instead could have only received up to the statutory maximum on that count. Moreover, Attorney Dalton cannot be expected to have had foresight to accurately predict additional counts in future superseding indictments. Therefore, the Court concludes that the upper sentence that he might have reasonably advised Petitioner of at the time of the proposed plea agreement was the statutory maximum in the First Superseding Indictment. Each of the fifteen counts in that document carried a statutory maximum of twenty years, for a total of 300 years if all were to run consecutively. The Court will therefore construe Petitioner's claim as a more general allegation that Attorney Dalton failed to accurately predict the likely sentence if Petitioner were convicted after a jury trial.

agreement give him one benefit: it would limit his exposure to no more than 20 years in prison, and that it would provide him with two or three level reductions for acceptance of responsibility under the Guidelines. *Id.* ¶ 6. This statement directly contradicts Petitioner's previous statements that Attorney Dalton never explained the benefit of the potential agreement or the application of the Guidelines. Petitioner also contradicts his previous assertion that Attorney Dalton never even suggested that he might receive more than 12 years if he went to trial. Instead, Petitioner says in his second affidavit, Attorney Dalton estimated that if he went to trial Petitioner would lose the points for acceptance of responsibility and therefore be subject to an offense level of 33, which would be a 135-168 month (11.25-14 years) sentence. *Id.* ¶¶ 6-7. According to Petitioner, Attorney Dalton said this would be his "highest risk" and that based on his experience, Petitioner would likely receive under 20 years if convicted at trial. *Id.* ¶ 7. Attorney Dalton also told Petitioner that hypothetically, his risk was the statutory maximum for each count, but that courts rarely impose such sentences and usually sentence within the Guidelines range. *Id.*

Because of the direct and material contradictions and inconsistencies between Petitioner's affidavits as to his discussions with Attorney Dalton, the Court finds those portions of both documents inherently incredible and accords little weight to either. For that reason alone, the Court concludes that Petitioner has failed to satisfy his burden of proving ineffective assistance of counsel on the part of Attorney Dalton. Assuming, however, that Petitioner's most recent version of what transpired (*i.e.*, the affidavit attached to his Reply) and the uncontradicted facts in his initial affidavit are accurate, however, the Court alternatively concludes that Petitioner has failed to establish a viable claim for relief.

7

In *Lafler v. Cooper* and *Missouri v. Frye*, the United States Supreme Court established that a defendant's right to effective assistance of counsel can be violated where defense counsel's deficient performance resulted in a rejection or lapse of a favorable plea offer. *Missouri v. Frye*, 132 S. Ct. 1399 (2012); *Lafler v. Cooper*, 132 S. Ct. 1376 (2012). In both cases, the Supreme Court concluded that the defendant had raised a viable claim under the two-part test of deficient performance and prejudice established by *Strickland v. Washington*, 466 U.S. 668 (1984).

In *Frye*, the Court declined to "try to elaborate or define detailed standards" that would define what constituted deficient performance in the plea bargaining process. 132 S. Ct. at 1408. It did, however, conclude that "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* That rule was sufficient to for the Court to conclude that the defendant's counsel had performed deficiently where he did not communicate the prosecution's offer to the defendant. The Supreme Court also provided guidance in an earlier case involving a claim that the ineffective assistance caused a defendant to accept a plea offer when the defendant was not informed of the collateral consequences of a plea. In *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010), the Court rejected the argument that *Strickland* claims in the plea bargaining context were limited to "affirmative misadvice." It reasoned that such rule would inappropriately "give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement." *Id.* Nonetheless, the Court emphasized, "[s]urmounting *Strickland*'s high bar is never an easy task." *Id.* at 371.

8

Indeed, the Court concludes that the already wide range of acceptable performance allowed by *Strickland* is particularly broad when a defendant raises a claim that he was not fully informed of the advantages and disadvantages of a plea agreement. The calculation of the potential benefits and disadvantages of a plea agreement is often a highly subjective enterprise that occurs quite early in a case. Accurate predictions and advice depend on speculation about the strength of the then-existing evidence, the calculation of Guidelines ranges and potential enhancements and reductions, and other factors. An attorney must also account for any protestations of innocence by their client. Probably for these reasons, the relevant American Bar Association guidelines, a source that the Supreme Court consulted in *Frye*, are rather vague on this point:

> To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

American Bar Association, ABA Standards for Criminal Justice: Pleas of Guilty 14-3.2 (3d ed. 1999), available at http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_g uiltypleas_blk.html.

Petitioner's claim is that Attorney Dalton informed him that the agreement would have the benefit of limiting his exposure to twenty years and that he would probably receive 9-12 years under the agreement, but would likely receive only a few more years if he went to trial because that would be the likely Guidelines range and judges usually do not impose the statutory maximum on each count. Petitioner argues he should have been informed that he would face life or the term-of-years equivalent if he went to trial. Reply at 3. Even if Petitioner's claims are

true, this does not amount to deficient performance for several reasons. First, Attorney Dalton promptly transmitted the agreement to Petitioner and by all accounts thoroughly discussed it and its estimated costs and benefits, meeting *Frye* and the consultation requirement embodied in the ABA standards quoted above. Second, according to Petitioner's first affidavit, Attorney Dalton recommended to Petitioner that he enter into the plea agreement, at least in part because he was highly likely to receive a lower sentence—an objectively accurate statement that accords with Dalton's statement that he advised Defendant of the offer's benefits. Third, Petitioner was indeed aware that there was at least a slight chance that he could receive a term-of-years sentence equivalent to life. The first page of the plea agreement, which Petitioner agrees he received, says that the statutory maximum was twenty years. Petitioner himself was a licensed attorney who earned his law degree in 1989 and an LLM in 1990, and practiced law until 2005. Presentence Investigation Report, ECF No. 311 (hereinafter PSR) ¶¶ 226, 227, 234. He could reasonably be expected to understand that if one count has a statutory maximum of 20 years, multiple similar counts would carry the potential of a greatly increased sentence. And Attorney Dalton's statement that a consecutive statutory maximum sentence on each count was highly unlikely was also reasonably accurate, particularly in light of the thirty-year sentence Petitioner did receive after a trial at which he was convicted of more counts than charged in the First Superseding Indictment.

Fourth, the Court finds that Attorney Dalton could not have been expected to reasonably provide a better prediction of Petitioner's actual Guidelines range and sentence. At the sentencing in this case, Petitioner's offense level was 43, which carries a Guidelines range of life in prison. Sentencing Tr. 153. Two of those levels were driven by a crime (promotional money laundering) of which Petitioner was not charged in the First Superseding Indictment. For the

10

count for which Petitioner was offered a plea, wire fraud, the adjusted offense level in the Presentence Report was 41. Attorney Dalton's calculation was an offense level of 30 had Petitioner pleaded guilty to that count. He reasonably predicted that Petitioner would not receive three points for acceptance of responsibility had Petitioner gone to trial, leading to an offense level of 33 and a Guidelines range of 135-168 months. But a year before trial, Attorney Dalton did not act deficiently in failing to predict the dramatic increase in that range in Petitioner's final Presentence Report: 1) that Petitioner would take the stand and lie at trial (2 points); 2) that the loss was over $7 million rather than over $2.5 million (which Attorney Dalton's calculation explicitly noted was an estimate) (4 points); and 3) that Petitioner would receive an enhancement for a vulnerable victim, which Petitioner's second attorney vigorously objected to at sentencing (2 points).

For all of these reasons, Attorney Dalton's performance was not deficient within the meaning of *Strickland*, where 1) he promptly provided Petitioner with the Plea Agreement and estimated Guidelines range, had a thorough discussion with Petitioner about it, and recommended that Petitioner accept the agreement, *Carillo-Morales v. United States*, 952 F. Supp. 2d 797, 804 (E.D. Va. 2013) (advising a defendant to take a favorable plea agreement exceeds what is required by *Strickland*); 2) he could not have been expected to precisely predict Petitioner's eventual Guidelines range; and 3) Petitioner, a highly educated and licensed attorney, can be expected to have an understanding that being convicted of multiple counts might increase his predicted sentence. Because Attorney Dalton did not perform deficiently, the Court need not address whether or not Petitioner was prejudiced by his performance.

## 2. Rule 11(c)(1)(C) plea & *Alford* plea

In his affidavits, Petitioner mentions that Attorney Dalton did not raise the possibility of either a Federal Rule of Criminal Procedure Rule 11(c)(1)(C) plea agreement or an *Alford* plea. However, Petitioner has not raised these claims as grounds for an ineffective assistance of counsel claim in either the § 2255 Petition itself, his Supporting Memorandum, or his Reply. Accordingly, the Court declines to address these claims as they were not properly raised. In the alternative, the Court finds that Petitioner has failed to show prejudice because he has not contested the Government's assertion that it would not have agreed to either arrangement, which the Government asserts are rare in this District. Govt. Resp. at 9-10.

## B. *Strickland* claims – Attorney Sacks

In the middle of 2009, about six months after the plea negotiations discussed above, Petitioner's parents researched hiring a private attorney to replace Attorney Dalton. Supp. Mem. 3. On August 10, 2009, two months before the then-scheduled trial date of October 6, 2009, Petitioner filed a Motion for Substitution of Counsel, as to which the Court held a hearing on August 17, 2009. At the hearing, the Court granted Petitioner's Motion and continued the trial to November 10, 2009 to enable Petitioner's new attorney, Andrew Sacks, time to prepare for trial. In addition to representing Petitioner at trial, Attorney Sacks also filed an appeal on Petitioner's behalf in the United States Court of Appeals for the Fourth Circuit.

Petitioner now raises a litany of claims of ineffective assistance against Attorney Sacks, in support of which Petitioner has attached voluminous evidence and exhibits, including his own affidavits. However, a § 2255 proceeding does not afford Petitioner the opportunity to comprehensively re-litigate his guilt or innocence. Accordingly, the Court will strictly confine its inquiry to whether Petitioner has satisfied his burden under *Strickland*. Moreover, the Court

will also limit its inquiry to those claims raised in Petitioner's § 2255 Motion and Supporting Memorandum. Statements made in Petitioner's affidavits, for example, are only relevant to the extent they provide supporting evidence for claims actually raised in the § 2255 Motion, Supporting Memorandum, and Reply. Finally, the Court must be mindful that "the standard for judging counsel's representation is a most deferential one" and that the "question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quotations omitted).

### 1. Pre-trial

Petitioner lists three claims of ineffective assistance pertaining to Attorney Sacks' performance prior to trial. Supp. Mem. 9. First, he contends that Sacks failed to truthfully represent to the Court that he could be prepared for trial at the substitution hearing. At that hearing, both the Government and Attorney Sacks agreed that it was advisable to delay the trial to allow Attorney Sacks adequate time to prepare. For example, the Government noted that the conduct giving rise to the case took place over a period of seven years and that there were 17,000 pages of scanned discovery. Substitution Hearing Tr., ECF No. 152, at 5-6. Attorney Sacks stated although he thought it was in the interests of justice to delay the trial date, he could be ready for the originally-scheduled date if the Court declined to continue the trial. *Id.* at 9. The Court selected a month extension to November for the new trial date, and refused further extension after Attorney Sacks asked if the following January was open and noted "the longer the better." *Id.* at 15-16.

Some two months later, and just over two weeks prior to the scheduled trial date, Attorney Sacks filed a motion to continue on October 26, 2009. ECF No. 154. He stated that

"[n]otwithstanding [his] diligent efforts to understand and prepare this case for trial on November 10, the [previously granted] continuance simply turns out to be insufficient time to adequately and effective investigate, research, examine, and prepare this case for a November 10 trial date, due to the extraordinary complexity of this case . . . ." *Id.* at 1. On October 29, 2009, the Court held a hearing on the matter. After hearing from Attorney Sacks regarding his asserted lack of ability to prepare adequately given the volume of materials and his time constraints, the Court noted that "[a]ll counsel find themselves in the place that you are with it not being enough [time to prepare]." Continuance Hr'g Tr., ECF No. 169, at 40. The Government then discussed what it had observed regarding Attorney Sacks' preparation, noting that he had only reached out to Petitioner's prior counsel in the past week and had only a few days ago asked the Government about the contents of a certain disk with discovery materials. *Id.* at 45-46. It also stated that given Attorney Sacks' immediately preceding testimony, it didn't "see how he can possibly go forward." *Id.* at 49. Attorney Sacks then insisted that he had spent time preparing, but that the case ended up simply being more complicated than he had expected.

A week later, the Court entered an Order denying the motion for a continuance. ECF No. 183. It noted that under Supreme Court precedent, "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 10 (1983) (internal quotations omitted). Particularly relevant for Petitioner's instant claim, the Court emphasized that defense counsel's "preparation is of utmost importance to a Defendant's Sixth Amendment right and must therefore be considered carefully." ECF No. 183, at 5. It observed that at the hearing, Attorney Sacks stated that he was "more prepared, frankly, in two months than the public defenders were in ten," and that the Court would rely on his representations of diligence in light of his experience and skill

the Court had previously observed. *Id.* at 9. The Court concluded that it was "confident" that Attorney Sacks "will provide the Defendant effective representation, and finds that on balance, no prejudice will result." *Id.* In Petitioner's direct appeal, Attorney Sacks argued that the Court's denial of a continuance was an abuse of discretion. The Fourth Circuit rejected the claim and noted that the Court appropriately balanced competing interests, was "neither arbitrary nor unreasoning," and that the 12 weeks provided to Attorney Sacks was "much more generous than that provided in similarly complex cases." 475 F. App'x at 832-33.

Although the Court is mindful of Attorney Sacks' statements regarding his lack of preparation at the continuance hearing, the Court cannot conclude that Petitioner has demonstrated that Attorney Sacks performed deficiently by representing at the time of the hearing on the Motion for Substitution that he would be adequately prepared for trial. Such a prediction was not unreasonable in light of the fact that the Court extended the trial date so that Attorney Sacks would have three months to prepare. In the Court's experience, such amount of time is typically adequate even for as complex a case as Petitioner's, and the Court adheres to its prior rulings at the time of the hearings that there was no Sixth Amendment violation. Any deficiency would arise from Attorney Sacks' failure to adequately use the time he was given to prepare, which brings the Court to Petitioner's next claim.

Petitioner's second claim pertaining to pre-trial performance is that Sacks failed to properly prepare for trial. However, even according to Petitioner's account of events, Sacks did conduct some pre-trial preparation. As just one example, Petitioner attaches as an exhibit an email from Attorney Sacks on October 1, 2009, indicating that he would have met with Petitioner (who was then incarcerated) for 11 hours over a four-day period and that he expected to meet with him again the following week. ECF No. 301-5. Because it is clear that the Court

15

cannot conclude Attorney Sacks was obviously deficient because of wholly inadequate preparation, it is necessary to evaluate the merits of this claim in the context of Petitioner's specific claims regarding ineffective performance at trial resulting from inadequate preparation. The Court is unable to evaluate Petitioner's broad claim in a vacuum, and therefore must address any deficient performance and prejudice in preparation as such claims manifested themselves during trial.

Third, Petitioner says that Attorney Sacks failed to examine all of the discovery materials and to read Petitioner's civil depositions. In his Reply, he makes much of the concession in Attorney Sacks' affidavit that he "did not read page-by-page every single discovery document" but instead focused his efforts "on those documents that [he] believed would be support the strategic goals" he had established with Petitioner. Sacks Affidavit, ECF No. 307-2, at ¶ 10. But as with Petitioner's second claim relating to pretrial conduct, the Court cannot assess the validity of this broad claim detached from the context of specific arguments regarding discovery documents that were inappropriately dealt with as a result of this claim. Petitioner has not pointed to any authority holding that it is categorically deficient performance for a defense counsel to fail to read every single page of discovery documents the Government produced, and the Court finds it reasonable for trial counsel to balance available resources, especially in a trial as complex as this, by focusing on documents that it expects will be the most relevant. Therefore, the Court will also address the specific permutations of this claim in the context of Petitioner's arguments regarding trial performance.

### 2. Trial

#### a. Cross-examination

Petitioner's first of six claims of ineffective assistance of counsel during trial is that Attorney Sacks failed to appropriately utilize discovery documents in cross-examination to impeach certain prosecution witnesses.   Petitioner provides little specific discussion or explanation in the body of his Supporting Memorandum or Reply of these claims.   Therefore, the Court must rely principally on Exhibits K through CC of the Supporting Memorandum, which Petitioner identifies as "documents that Mr. Sacks should have used during cross-examination but he hadn't prepared sufficiently for trial to be aware of them and/or their significance to government witnesses' testimony." Supp. Mem. 13.  The Court will also refer to Exhibits B through G of the Reply, which include excerpts of testimony that Petitioner says would have been undermined by the introduction of discovery documents.

Exhibits K through N are documents that Petitioner says should have been used to impeach government witness Kerry Barone, one of Petitioner's former clients.  Supp. Mem., Index to Exhibits.  During its direct examination of Mrs. Barone, the Government sought to prove that Petitioner fraudulently induced Mrs. Barone and her husband to transfer ownership of their property to an LLC to protect it from seizure by the IRS.  That LLC was actually controlled by Petitioner, and he later encumbered the property with numerous liens without the Barones' knowledge and consent.  Trial Tr. 1560-1586.  Attorney Sacks conducted an extensive cross-examination of Mrs. Barone, during which he asked her, for example, about prior inconsistent statements to investigators, *e.g.*, *id.* at 1594-95, and about her view of the "partnership" she and her husband entered into with Petitioner, *id.* at 1597-99.

Petitioner most heavily emphasizes Exhibit K of his Supporting Memorandum, specifically, a "Confirmation and Receipt" apparently signed by Mrs. Barone and her husband on April 25, 2006, confirming receipt of $700,000 from the LLC in exchange for the Barones' property. It states that "[w]e had to sell to an investor at a deep discount so we didn't lose the property altogether." Petitioner insists this directly contradicts Mrs. Barone's testimony, Reply, Ex. A, at 19-20 (discussing the impact of that statement), but it is not clear to the Court how it contradicts her testimony on direct examination that she understood that the Barones were transferring ownership of the property to an entity which would protect the property until it could be sold. The Confirmation and Receipt specifies that the $700,000 includes the assumption of mortgages on the property. In his Reply, Petitioner includes portions of Barone's cross-examination and notes that she "sold" the house next to her statements that she had a "partnership" with her husband and Petitioner. To the extent Petitioner contends that the Confirmation and Receipt should have been used to contradict a theory raised by Attorney Sacks that impeached Barone's direct examination—*i.e.*, that they voluntarily partnered with Petitioner for their benefit in an arrangement that eventually turned out not to be profitable—Petitioner's suggestion would not have aided Attorney Sacks' trial strategy. In sum, in light of Attorney Sacks' through cross-examination of Barone, the Court cannot conclude that introduction of this document would have enhanced that cross-examination; accordingly, it was not deficient performance to fail to introduce it.

Exhibit L is an assessment by a realtor that the Barones' property could sell for $1.2 million. The Court concludes that this document would not have successfully undermined the Government's theory that Petitioner fraudulently encumbered the Barones' property with liens. Although it might have had incremental value in showing Petitioner's state of mind, it would

have had ultimately little to do with the Government's theory of fraudulent conduct. Moreover, Petitioner himself testified that he had the property assessed for approximately that value. Trial Tr. 3111. Next, Petitioner asserts that Exhibit M is proof of payment of $25,000 to the Barones, which he says undermines Mrs. Barone's testimony that Petitioner offered to help them with their property for no compensation. But Mrs. Barone herself conceded on cross-examination that Petitioner "probably" paid approximately $35,000 to various entities on their behalf. Trial Tr. 1616. Finally, Exhibit N is an unsigned "agreement" between Petitioner and the Barones. A document that the Barones did not sign would have had little weight and credibility and therefore was reasonably not selected for introduction by Attorney Sacks. Moreover, Mrs. Barone conceded on cross-examination that the agreement was that if Petitioner invested $1,000, he would receive $2,000 in return. Trial Tr. 1607-08. For these reasons, the Court concludes that Petitioner was not prejudiced by Attorney Sacks' not using Exhibits L through N during Mrs. Barone's cross-examination.

Exhibits O through R are documents Petitioner contends should have been used during the cross-examination of Mrs. Rani Stoddard. Supp. Mem., Index to Exhibits. Mrs. Stoddard testified that she met Petitioner at a real estate investment seminar and wired $100,000 to an LLC after Petitioner told her that he would invest the money in a certain property. Trial Tr. 2343-44. Exhibit O is an email from Mrs. Stoddard apparently to an individual who had done work for Petitioner and had sent bills for that work to Stoddard. She said that she had no idea that Petitioner had that amount of work done, and that the extent of her relationship with Petitioner was that she bought two houses from him. She emphasized that she was not in business with Petitioner, that "[t]here is no entity arrangement, no partnership, no agreement," and that therefore she was not liable for his business debts. Supp. Mem., Ex. O. The Court

19

concludes that this email would have done little, if anything, to undermine Mrs. Stoddard's testimony. Although she did acknowledge at trial that she had some sort of business and investment arrangement with Petitioner, *e.g.* Trial. Tr. 2349, that is not necessarily inconsistent with her disclaiming of any agreement that would obligate her to assume Petitioner's bills. Moreover, the email could have prejudiced Petitioner because it would have undermined Attorney Sacks' reasonable strategy of arguing that Stoddard was in a business partnership with Petitioner, Trial Tr. 2382, and would have suggested that Petitioner had numerous debts and commitments that he did not pay that Stoddard was completely unaware of and had not agreed to or expected. Therefore, Attorney Sacks was not deficient for failing to introduce this exhibit.

Exhibit P is an email between Mrs. Stoddard and Petitioner that Petitioner avers contradicts Stoddard's testimony that she believed that the $100,000 would be used to improve the property in which she understood that she was investing. In his email, Petitioner gave Mrs. Stoddard wiring instructions and told her that he would give her "figures from the contractor for the addition." Supp. Mem. Ex. P. The email does not directly contradict her testimony and would have done little to undermine it as a whole. Exhibits Q and R are a deed dated December 2005 and a promissory note adjustment from October 2006. Petitioner fails to explain how the deed undermines the Government's theory that Petitioner fraudulently induced Stoddard to pay him $100,000, which was never repaid. Petitioner contends that the promissory note adjustment, which relates to different properties, contradicts Mrs. Stoddard's statements that he owed her money. However, it appears unreliable as it is dated October 20, 2006, but purports to adjust a note dated in the future for October 31, 2006. And just because Mrs. Stoddard owed money to Petitioner as to certain properties does not mean that he did not owe her money as to others. In any event, more context is needed for both documents to support a showing that they would have

20

impeached Mrs. Stoddard's testimony in a significant manner. For these reasons, Attorney Sacks did not perform deficiently in failing to introduce Exhibits P through R during Mrs. Stoddard's testimony.

Exhibits S and T are documents Petitioner contends should have been used during the cross examinations of every "Ark-connected" witness. Supp. Mem., Index to Exhibits. The Ark is a financial advisory firm that referred clients to Petitioner. Trial Tr. 1048. 1051. Exhibit S is an email with a series of questions between an investor, Robert Cameron, and Petitioner, in which Petitioner answers a series of questions from Mr. Cameron. Attorney Sacks did in fact introduce this email as a defense exhibit during the cross examination of Mr. Cameron. Trial Tr. 1441. Petitioner's contention is that as Mr. Cameron appeared to accept the answer of one of the questions, all other witnesses involved in the same scheme must have also. First, any such inference about Mr. Cameron was undermined by his testimony that he did not understand what a "controlled foreclosure" is, the topic of that portion of the email. Trial Tr. 1432. Second, the inference that other witnesses must have had the same views as Mr. Cameron because of this email is so tangential that the Court questions whether it would have been even relevant to introduce during the other witnesses' testimony. In any event, the jury was aware of the email, and Attorney Sacks did not perform deficiently by not asking other witnesses about it.

Exhibit T is an email string regarding The Ark investments between The Ark's vice-president and investors, and Petitioner contends that it should have introduced because he was not copied on the emails, which he contends demonstrates that he lacked knowledge. The owner of The Ark, Stephanie Olsen, conceded on cross-examination that The Ark's vice president acted as a go-between for Petitioner and investors. Trial Tr. 1072. The Ark's vice president repeatedly confirmed this during her own testimony, describing how she would refer investors to

21

Petitioner and "try to help them communicate" with him, and would forward information she received from Petitioner to the clients via email or fax. Trial Tr. 1104-08, 1112, 1116, 1125. Therefore, the few emails that Petitioner references would have only confirmed these representations. Even more importantly, Attorney Sacks brought up on cross-examination that Petitioner was not copied on at least some of her emails. Trial Tr. 1133-35. Therefore, Attorney Sacks was in no way deficient for failing to introduce this particular email string during any cross-examination.

Exhibits U through W relate to Petitioner's claim that Attorney Sacks was ineffective for failing to call an expert witness, and the Court will discuss those documents below, as relevant, in the context of that claim.

Petitioner argues that Exhibit X should have been used during the cross-examination of defrauded investor Mrs. Doris Addenbrook because it shows that she is "a sophisticated businesswoman." Supp. Mem., Ex. X. Exhibit X is a handwritten note from Addenbrook to Petitioner dated January 19, 2005. But Attorney Sacks raised similar arguments on cross examination, noting, for example, that Addenbrook obtained a second opinion from another attorney before engaging in the disputed transaction. Trial Tr. 578. Therefore, the Court concludes that Attorney Sacks did not perform deficiently by failing to introduce that note.

Next, Petitioner argues that Attorney Sacks should have introduced Exhibits Y and Y.1 during the cross-examination of Dale and Sharlana Russell, defrauded investors. Exhibit Y is an email from Mr. Russell to Petitioner stating in part that "[w]e need some security against the money we sent you." Petitioner contends that this contradicts Mr. Russell's testimony that he thought that the money he sent to Petitioner was secured. But as Petitioner concedes, Attorney Sacks did elicit the lack of a written agreement embodying Petitioner's promises during cross-

examination, Trial Tr. 2202, as he did with many other witnesses. Additionally, this email was already introduced as an exhibit by the Government. Similarly, Exhibit Y.1 is a note from Petitioner to Attorney Sacks recommending that he emphasize the lack of a written agreement. Because the Court finds that Attorney Sacks did consistently emphasize that theme, he did not perform deficiently with respect to either of these exhibits.

Exhibit Z is apparently a handwritten note written by Mary Smith, one of Petitioner's employees. On a notebook page with a flight schedule and other information, it says, "me & Jessie are launder [sic] money for Troy [*i.e.*, Petitioner]." Petitioner says this should have been used to undermine Smith's credibility. Even assuming that this note is valid and could have been authenticated, it would cast as much doubt on Petitioner as it would on Smith, as it could have implied that Petitioner asked Smith to launder money for him. Additionally, Attorney Sacks had already attacked her credibility by attempting to impeach Smith with inconsistent prior statements. Trial Tr. 2549-50. Accordingly, Attorney Sacks was not deficient for failing to introduce this handwritten note.

Petitioner maintains that the next document, Exhibit AA, should have been used during the cross-examination of his co-defendant Kristina Cardwell with whom Petitioner engaged in a series of straw transactions. She pleaded guilty in December 2008. It includes an email between Ms. Cardwell and the mortgage company that worked on the straw purchases, and because Petitioner was not copied on the email, he says it should have been used to show his lack of involvement. He also includes a lease agreement that he says he suggested to Cardwell as a "legal method" to qualify her for the mortgages. The Court concludes that neither document would have undermined Cardwell's testimony to an extent that would have added to Attorney Sacks' already extensive cross-examination during which, for example, Cardwell agreed that

23

Petitioner didn't tell her to lie. Trial Tr. 1878-79. *See also* Trial Tr. 1890, 1892. Therefore, Attorney Sacks was not deficient in failing to introduce these documents.

Exhibit BB is a Promissory Note that Petitioner contends should have been used in the cross-examination of Howard Keesler, a client who gave him $200,000 after Petitioner told him he would use the funds to purchase a certain property. However, Mr. Sacks did use it and introduce it during cross-examination. Trial Tr. 1665. He extensively queried Keesler about it. Accordingly, Petitioner's contention regarding this exhibit is without merit.

Finally, Exhibit CC is a Joint Venture Agreement between Mary Honning and Petitioner introduced at trial by the Government, Trial Tr. 2400, filled with notes from Petitioner. Petitioner says Attorney Sacks was deficient for failing to take up his suggestion in one of those notes that the property at issue was worth between $300,000 and $500,000 at the time of that agreement. Given Mrs. Honning's testimony and other evidence regarding his defrauding of her, the Court finds that the actual value of the 69th Street property at the time of the agreement is of little relevance. Accordingly, Attorney Sacks was not deficient for failing to introduce it.

In sum, Attorney Sacks was not deficient with respect his use (or lack thereof) of the documents Petitioner specifically identified in the Supporting Memorandum to his § 2255 Petition. Each document had little relevance in the context of the evidence against Petitioner, and Attorney Sacks' chosen cross-examination of the witnesses at issue was reasonable and thorough. *Wilson v. Ozmint*, 352 F. 3d 847, 860 (4th Cir. 2003) ("The simple standard for assessing counsel's competence is whether his assistance was reasonable considering all the circumstances." (quotations omitted)). To the extent Petitioner has referenced other discovery documents that might have been used during cross-examination in his Supporting Memorandum or attached Affidavit, the Court concludes that Petitioner has failed to support his burden as to

those documents because he has not presented them to the Court to enable it to assess his claims. The foregoing also requires the rejection of Petitioner's claim regarding Attorney Sacks' inadequate trial preparation, as it indicates that Attorney Sacks was not deficient for failing to read every page of every discovery document.

### b. Failure to call expert and fact witnesses

Petitioner's second claim relating to Attorney Sacks' performance at trial was his failure to interview and call witnesses other than Petitioner, including his failure to call expert witnesses. As to non-expert witnesses that Attorney Sacks failed to call, Petitioner identifies Mr. Shuler, Mr. King, Mr. Cochran. Supp. Mem. 14, Reply 12. Contrary to Petitioner's assertion that "counsel failed to call a single fact witness in rebuttal of the prosecution's case other than his own client," Supp. Mem. 18, Attorney Sacks did call several witnesses other than Petitioner. After the Government concluded its presentation of evidence, the defense first called Danny Taylor, an investigator for the Virginia State Corporation Commission who had also testified as a witness for the Government, and asked him about prior statements regarding one of Petitioner's clients. After Petitioner testified for approximately two days, Attorney Sacks called two more witnesses. The first was Thomas Tierney, an FBI agent and the lead case agent for Petitioner's case. Attorney Sacks asked him about several interviews with witnesses—Mr. Rochevot, Mrs. Poole, Mrs. Barone, Mr. and Mrs. Sawyer, and Mrs. Honning—and raised statements that the witnesses made in those interviews that were inconsistent with their testimony at trial. Finally, Attorney Sacks called another FBI agent, Thomas Siska, and asked him about his interviews with Mr. Bushman and Mrs. Addenbrook.

The Fourth Circuit has held that overcoming *Strickland*'s presumption of reasonableness is particularly difficult for a claim of ineffectiveness for failing to call at witness, "given that the

decision whether to call a defense witness is a strategic decision demanding the assessment and

balancing of perceived benefits against perceived risks, and one to which we must afford

enormous deference." *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (quotation and

punctuation omitted). In his affidavit, Attorney Sacks explains his decision:

> I believed as a matter of trial tactics that all of the necessary evidence and proof to either
> support or corroborate Mr. Titus' defenses and explanations had come out primarily
> through the cross-examination of the Government's witnesses, and that while I had a
> lengthy list of possible witnesses . . . , I did not feel that any could add anything to the
> record already developed.

ECF No. 307-2 ¶ 31.

First, Petitioner contends that Attorney Sacks was deficient for failing to call Mr. Pat

Shuler, a CPA hired by Petitioner and involved in the Virginia State Bar's investigation of

Petitioner's misconduct. In support of that contention, Petitioner attached Exhibit V to his

Supplemental Memorandum, an "exceptions list." Petitioner argues that Mr. Shuler could have

testified "that his 'exceptions' figures did not reflect a negative bank balance as the government

argued to the jury repeatedly." Supp. Mem. 18. Additionally, Petitioner maintains Mr. Shuler

could have been called as an expert to demonstrate that "the vast majority of the money I

borrowed was used to acquire real estate, rehabilitate real estate, and pay debt associated with

real estate which was the opposite of what the government alleged but didn't attempt to prove."

*Id. See also* Supp. Mem., Ex. A ¶ 15 (contending that Mr. Shuler could have explained that the

exceptions list "is a product of an informal audit that simply means that the item has not been

located, *not* that there is a corresponding deficit in the account").

In his Affidavit, Attorney Sacks specifically addresses why he did not call Mr. Shuler.

He says that "from a tactical standpoint" Mr. Shuler "would merely serve to underscore what

was already a very damaging document," namely, Petitioner's Affidavit consenting to revocation

26

of his bar license. ECF No. 307-2 ¶ 38. The potential downside of calling Mr. Shuler is also confirmed by the Government's indication that it planned to call him as a witness had Petitioner's Affidavit not been admitted. Trial Tr. 1296. The Court concludes that Attorney Sacks' decision falls within the broad deference accorded to defense counsel's decision whether or not to call witnesses. During the cross-examination of another witness, Attorney Sacks raised various discrepancies regarding Mr. Shuler's assessment of Petitioner's finances. Trial Tr. 2495-99. Moreover, on cross-examination Petitioner himself addressed the issue of the exceptions list. Trial Tr. 3275-80. Even assuming Mr. Shuler would have lent additional credence to Petitioner's argument had he testified, he also could have served to provide further detail on the conduct that led to the loss of Petitioner's law license. Therefore, it was not deficient not to call him. Moreover, Petitioner has not explained how his purported testimony would have impacted the verdict, so Petitioner has also failed to show prejudice.

Petitioner also contends that Attorney Sacks is deficient for not calling Mr. Brad King to testify regarding the values of certain properties. Supp. Mem. 18. Not only does Petitioner only specifically address one property that he might have valued, *id.* Ex. L, a document the Court addressed above, but Petitioner does not explain how evidence that properties were worth a certain amount of money would be sufficient to undermine the "mountain of evidence," *Titus*, 475 F. App'x at 839, supporting the jury's finding of a specific intent to defraud. Therefore, Petitioner has not failed to satisfy his burden of showing that the failure to call Mr. King resulted in any prejudice.

Finally, Petitioner argues that Attorney Sacks was deficient for failing to call Mr. Jerry Cochran, a mortgage lender who Petitioner alleges could have "testified that every loan application and supporting documents ever presented to him by me were true and correct and

that my conversations with him regarding the Cardwell mortgage applications centered on valid and truthful representations for loan qualifications and nothing false or misleading." Supp. Mem. 18. *See also id.* Exhibit AA (stating that Cochran would have been able to discredit Cardwell's "claims that she was acting on my orders to commit federal loan fraud in her loan applications"). Petitioner has not demonstrated that Attorney Sacks' failure to call Mr. Cochran prejudiced him. The key issue as to Petitioner's liability regarding Cardwell's straw purchases were Petitioner's interactions with Cardwell, not Petitioner's interactions with Cochran, as Cardwell primarily acted as an intermediary between Cochran and Petitioner. *E.g.*, Trial Tr. 1768-70, 1783. Whether or not Petitioner was truthful with Cochran would therefore have been of limited relevance.

Petitioner also contends that Attorney Sacks was ineffective for failing to call any expert witnesses. Petitioner raises multiple arguments in this vein. His general contention that Attorney Sacks was ineffective simply for failing to call any expert witnesses in light of the Government's use of an expert is unavailing. As the Supreme Court has held, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 131 S. Ct. at 791. The Court has already addressed why Attorney Sacks was not ineffective for not calling Mr. Shuler as a witness. Beyond Mr. Shuler, however, Petitioner does not specifically identify which expert Attorney Sacks should have called.   In his Affidavits, he asserts that an expert should have been called in certain fields to explain the complexity of the case to the jury. *E.g.*, Supp. Mem., Ex. A ¶ 5 ("He never suggested using an expert witness accountant, real estate appraiser, real estate agent, title underwriter, or attorney in my defense."); *id.* ¶ 34. But Petitioner does not explain how shedding further light on the transactions would have benefited him more than the

prosecution. Similarly unavailing is Petitioner's conclusory assertion that an expert could have "easily dispensed" with allegations that Petitioner ran a Ponzi scheme. *Id.* ¶ 27. Petitioner's example of an expert who might have explained the importance of a witness's statement that Attorney Sacks elicited on cross-examination, *id.* ¶ 25, is so minor that it could not have impacted the trial outcome. His final example of an expert who could have explained controlled foreclosures and shown that Petitioner's reliance on that procedure was reasonable, *id.* ¶ 30, might have undermined Attorney Sacks' strategy of highlighting that investors should have themselves understood the implications of a controlled foreclosure and implying that they lacked diligence in failing to understand them. *E.g.*, Trial Tr. 1308-09, 1388-91, 1431-32, 1439-40. For all of these reasons, Petitioner has failed to show that Attorney Sacks was deficient in failing to call an expert witness as part of the defense's case.

### c. Failure to use a defense strategy throughout trial and closing argument

Petitioner's third contention regarding Attorney Sacks' trial performance is that he lacked a defense strategy through trial and his closing argument. *E.g.*, Supp. Mem. 10 (arguing that Sacks "failed to understand the case well enough to utilize a defense strategy" and "failed to use his best themes during his closing argument"); *id.* Ex. A ¶¶ 17, 24-25 (raising points that Sacks did not make in his closing argument). Both assertions lack a specific argument and explanation that would satisfy Petitioner's burden under *Strickland*. Throughout trial, Attorney Sacks consistently emphasized prior inconsistent statements of alleged victims, their own lack of diligence, and Petitioner's lack of intent, among other themes. Choosing to focus on the cross-examination of Government witnesses is an entirely reasonable and commons strategy. Accordingly, Petitioner has shown neither deficient performance nor prejudice as to his

argument regarding Attorney Sacks' lack of a defense strategy, especially in light of the jury's

acquittal of Petitioner on multiple counts and its inability to reach a verdict on others.

### d. Failure to request sufficient time for Petitioner's testimony

Petitioner's next contention is that Attorney Sacks was deficient for failing to move for

"sufficient time" for Petitioner's testimony. Supp. Mem. 10; *id.* Ex. A ¶ 33. Petitioner began his

testimony in the morning of December 9, 2009, and concluded in the morning of December 11,

2009, testifying for approximately two full days. Petitioner does not explain what he would have

said had he additional time to testify. Accordingly, he has failed to satisfy his burden of showing

prejudice under *Strickland*, particularly when it is unlikely that the Court would have granted

him additional time to testify even if Attorney Sacks had so moved. *See* Trial Tr. 3171-72 ("I

think the Court has given you ample time to explore with him your position on these issues . . .

At 10:45 we are moving on."). *See also United States v. Titus*, 475 F. App'x at 837-38

(limitation on Petitioner's testimony was not an abuse of discretion).

Related to the subject of Petitioner's own testimony, the Court will also briefly address

Petitioner's claim that Attorney Sacks was deficient for asking him about a matter on which

Petitioner was later impeached for having made prior inconsistent statements in civil depositions.

*E.g.*, Reply 12; Trial Tr. 3303-07. First, the Court concludes that a decision to commit perjury

while under oath at either trial or in the civil proceedings was Petitioner's, and is not one that he

can now blame on Attorney Sacks. Second, many witnesses at Petitioner's trial admitted prior

inconsistent statements, and Attorney Sacks might have reasonably concluded as a matter of trial

strategy that the benefit of attempting to establish Petitioner's ownership of an entity surpassed

the cost of the exposure of a prior inconsistent statement.

### e. Failure to subpoena various documents

Petitioner's final claim relating to Attorney Sacks' performance at trial is that he failed to subpoena various documents, namely, 1) Petitioner's email account, which would have revealed that he "never lied to potential lenders to induce them to loan me money and that all of the email communication would be consistent with my testimony and much of it inconsistent with the allegations being made against me," and 2) tax returns from Cardwell and Rochevot that would have proved his ownership of two entities. Supp. Mem. 14. As to Petitioner's email account, even assuming the accuracy of his statement, Petitioner has not shown how the absence of an intent to defraud in emails could contradict the "mountain of evidence" supporting a showing of an intent to defraud. *Titus*, 475 F. App'x at 839. As to tax returns from Cardwell and Rochevot, these entities were principally relevant for Morris and Diana Poole, whom Petitioner acknowledges the jury did not find credible. Supp. Mem. 17; Third Superseding Indictment 44-45.

### 3. Sentencing

Although the bulk of Petitioner's filings focus on Attorney Sacks' trial preparation and performance, Petitioner also contends that he was ineffective at sentencing. Petitioner's conclusory assertion that he "failed to properly prepare for sentencing" is, like Petitioner's allegations regarding Attorney Sacks' trial preparation, a claim that must be properly argued by showing specific deficiencies. In light of the numerous objections Attorney Sacks raised at sentencing, it is evident that he did prepare for the hearing. *E.g.*, Defendant's Position on Sentencing, ECF No. 223. Petitioner also contends that Attorney Sacks did not review the PSR with him prior to sentencing, an allegation which Attorney Sacks does not rebut in his affidavit. However, Petitioner does concede that he did meet with Attorney Sacks prior to sentencing, and

31

encloses a letter that he received prior to their meeting that also included the PSR and asked Petitioner to review it and be ready to raise any objections he might have. *See* Supp. Mem., Ex. A ¶ 42; *id.* Ex. DD. In light of the lengthy trial in this case, which would have given Petitioner extensive familiarity with the relevant facts, and Petitioner's own education and prior experience as a lawyer, the Court concludes that it was not deficient performance to not review the PSR with Petitioner where Petitioner was given an advance copy that he was asked to review. Moreover, Petitioner has not explained how he was prejudiced and has not pointed to objections that he would have sought had Attorney Sacks reviewed the document with him.

Petitioner's last claim pertaining to sentencing is that Attorney Sacks failed to present evidence at sentencing that would have rebutted the factual allegations in the PSR. Supp. Mem. 10. But Petitioner has not pointed to what evidence should have been presented; nor does he cite case law establishing that it is deficient to fail to present evidence at sentencing and instead to rely on argument and objections. Accordingly, Petitioner has not established that Attorney Sacks performed deficiently.

### 4. Appeal

Petitioner's final claim of ineffective assistance as to Attorney Sacks is that he failed to prosecute an effective appeal in the Fourth Circuit. Supp. Mem. 10. However, Petitioner's filings are devoid of specific argument on this point, so the Court concludes that he has failed to sustain his burden under *Strickland*.

\*     \*     \*

In sum, after observing the trial and sentencing in this case and after reviewing Petitioner's filings in this § 2255 proceeding, the Court is confident that Attorney Sacks conducted a vigorous defense that satisfied the requirements of *Strickland*. That Petitioner was

32

acquitted on multiple claims and that the jury was unable to reach a verdict on others is evidence of his effective performance. Finally, the Court must note that Petitioner twice signed statements indicating that he was satisfied with Attorney Sacks' performance at trial. Supp. Mem., Ex. A. 16.

## C. *Strickland* claims – Attorney O'Mara

After the Fourth Circuit ruled in the Government's favor on appeal, another attorney from Attorney Sacks' firm, William O'Mara, filed a petition for a writ of certiorari on behalf of Petitioner in the United States Supreme Court. Petitioner contends that Attorney O'Mara's petition was defective because it failed to cite Rule 10 of that Court, which discusses the circumstances in which the Supreme Court would be likely to grant a petition for a writ certiorari. However, Petitioner has no constitutional right to effective assistance in the filing of a petition for certiorari. *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008); *Moscol v. United States*, Nos. 5:07-cr-3-01, 5:10-cv-93, 2010 WL 4704403 at *2 (E.D.N.C. Nov. 12, 2010). Even if Petitioner did have such a right, he has not identified which arguments should have been raised in his petition for certiorari that would have had a greater chance of success. Moreover, Attorney O'Mara has included an unrebutted email between his firm and Petitioner in which Mr. Sacks outlines the requirement of Rule 10, tells Petitioner which claims he recommends pursuing to comply with that Rule, and Petitioner replied, "I wholeheardly [sic] agree with your assessment, please proceed accordingly." ECF No. 307-4.

## D. Evidentiary Hearing & Discovery Motion

Petitioner has requested an evidentiary hearing to the extent any disputed issues of material fact arise. Supp. Mem. 1, 9, 22. Title 28 U.S.C. § 2255 provides that a hearing should be granted "[u]nless the motion and the files and records of the case conclusively show that the

33

prisoner is entitled to no relief." *See also United States v. Witherspoon*, 231 F.3d 923 (2000). If "a fact is material and the issue genuine, then an evidentiary hearing is required." *McLamb v. United States*, 7:98-CR-62-1-F, 2007 WL 160933 (E.D.N.C. Jan. 16, 2007). However, the Court concludes that Petitioner has not met the requisite standard for an evidentiary hearing. As to all of the material evidence for Petitioner's claims, the Court has either been able to accept as true Petitioner's contentions, or the affidavits of the Government are unrebutted. As to Petitioner's inconsistent affidavits regarding his *Lafler* claim, which the Court found inherently incredible, the Court in the alternative accepted Petitioner's most recent affidavit as true. Accordingly, Petitioner's request for an evidentiary hearing is **DENIED**.

After his § 2255 Motion was fully briefed, Petitioner filed a Motion for Discovery on February 10, 2014. ECF No. 310. The Government did not file a Response to the Motion. In that Motion, Petitioner requests that the Court order:

- The Government to provide all of its 302s and MOIs and a copy of its witness list as well as all documents possessed by the U.S. Attorney and the FBI containing names of witnesses and interviewed parties.

- Attorney Sacks to provide a copy of his 2009 calendar.

- Depositions from Janelle Brunner, Patty Rochevot, Glen Stoddard, John Barone, and Jerry Cochran regarding the issues raised in his § 2255 Petition.

- Attorney Dalton to provide a supplemental affidavit.

- Interrogatories of the Government and unnamed witnesses.

- John Rochevot "to produce the documents in question relative to his testimony."

- John and Kerry Barone to produce a copy of their mortgage application and closing documents for their April 2006 purchase of a Suffolk property.

- Doris Addenbrook to provide a copy of her pleadings in her civil case against Petitioner.

- AOL to provide Petitioner's emails from 2004 to 2006.

34

Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." A party requesting discovery under the rule "must provide reasons for the request[,] must ... include any proposed interrogatories and requests for admission, and must specify any requested documents." *Id.* Rule 6(b). Interpreting a prior version of Rule 6(a) that also used the "good cause" standard, the United States Supreme Court in *Bracy v. Gramley* reiterated that good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." 520 U.S. 899, 908-09 (1997) (internal quotations omitted). *See also United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004). The Court concludes that Petitioner has not shown the requisite good cause. In light of the claims the Court has already resolved and the documents Petitioner has already presented, the Court finds that Petitioner has not established a reasonable inference that the discovery he requests would yield materials that would entitle him to relief. Accordingly, his Motion for Discovery is **DENIED**.

## E.  Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. § 2255, the court is also required to issue or deny a certificate of appealability, which may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where the court denies petitioner's habeas petition on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *see also Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct.

35

1029, 154 L.Ed.2d 931 (2003).  Petitioner does not satisfy this standard; accordingly, the Court **DENIES** a certificate of appealability.  Although Petitioner may not appeal the denial of his § 2255 Motion without a certificate of appealability, he may still seek one from the United States Court of Appeals for the Fourth Circuit.

### IV. CONCLUSION

For the reasons set forth above, the Court finds that it is clear from the pleadings, files, and record that Petitioner is not entitled to relief.  Accordingly, Petitioner's Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255 is **DENIED**.  Petitioner's request for an evidentiary hearing and his Motion for Discovery are also **DENIED**.  Petitioner is also **DENIED** a Certificate of Appealability.

The Court **DIRECTS** the Clerk to mail a copy of this Order to Petitioner and to the United States Attorney.

**IT IS SO ORDERED**.

Raymond A. Jackson
United States District Judge

Norfolk, Virginia
May 2⁷ , 2014